UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NAJMA MAHAMED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-13258-LTS |
| | ) | |
| CAROLYN COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

ORDER ON PLAINTIFF'S MOTION TO REVERSE OR REMAND
AND DEFENDANT'S MOTION TO AFFIRM

November 9, 2015

SOROKIN, J.

Plaintiff Najma Mahamed ("Mahamed") seeks reversal of the decision by Defendant Carolyn Colvin, the Acting Commissioner of Social Security ("the Commissioner"), denying Mahamed's claim for Supplemental Security Income ("SSI") benefits. Doc. No. 16. The Commissioner seeks an order affirming the decision. Doc. No. 24.

For the reasons set forth below, Mahamed's Motion to Remand the Commissioner's decision is ALLOWED, and the Commissioner's Motion to Affirm her decision is DENIED.

I.   BACKGROUND

   A.   Procedural History

Mahamed, claiming disability from left eye blindness and depression, filed a claim for Supplemental Security Income on April 7, 2011. A.R. at 190-94.[1] On July 18, 2011, her claim was denied on initial review. Id. at 100. On August 29, 2011, she requested a hearing by an Administrative Law Judge ("ALJ"). Id. at 107. She attended a pre-hearing conference on September 7, 2012. Id. at 54-60. The ALJ held the hearing on December 19, 2012. Id. at 61-85. The ALJ denied Mahamed's claim on February 20, 2013. Id. at 19. Mahamed appealed on April 25, 2013. Id. at 13. On June 4, 2014, the Appeals Council denied Mahamed's request for review, making the ALJ's decision final. Id. at 1. On August 7, 2014, Mahamed filed this action for judicial review. Doc. No. 1.

    B.    Mahamed's History

Mahamed, thirty years old at the date of the hearing, was born in Somalia. Id. at 66-68. She has never attended school. Id. at 67-69. Her sole work experience consists of brewing tea and coffee and selling it on the streets of Somalia in 2003. Id. at 72. She was assaulted in 2006 and still suffers from eye pain and numbness on the left side of her face. Id. at 198, 239, 306, 349. She entered the United States as a refugee between December 13 and 15, 2010. Id. at 69, 252.

    C.    Mahamed's Physical Impairments

Since her 2006 assault, Mahamed has complained of constant, severe eye pain and numbness on the left side of her face. See id. at 260, 288, 299, 306, 342, 354. She was further diagnosed with glaucoma in Somalia and, at the time of the hearing, was blind in her left eye. Id. at 308, 329. She also reported experiencing severe headaches for many years, which cause

---

[1] Citations to "A.R." are to the Administrative Record, Doc. No. 13. Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

dizziness and blurred vision. Id. at 260, 314. These headaches normally occur only a few times a month, but can increase in frequency. Id. at 314.

Additionally, Mahamed had several surgeries before coming to America. In 2006, she had surgery to repair a detached retina. Id. at 252. In 2008, she traveled to Egypt to undergo a vitrectomy. Id. at 299. Since January 24, 2011, she has been a patient at the Ross Eye Institute and visited at least six times between then and April 11, 2011. Id. 239-47.

Mahamed also reported experiencing intermittent hand tremors and falling when walking. Id. at 322. MRI testing revealed multifocal white matter lesions throughout both of her cerebral hemispheres, possibly indicating multiple sclerosis. Id. at 322-23.

D.   Mahamed's Mental Impairments

Mahamed visited the Niagara Family Health Center ("Niagara Center") in Buffalo, New York on January 27, 2011, where she was diagnosed with depression. Id. at 252. She returned to the Niagara Center on February 25, 2011 to follow up on lab work from her previous visit, and to receive any necessary vaccinations. Id. at 252. During this visit, the Niagara Center reaffirmed the depression diagnosis and noted next to the indication that she "lost Mother & Dad & 3 siblings." Id. at 254. The Niagara Center further noted that Mahamed resisted taking any medication for her depression. A.R. at 256.

On June 24, 2011, Dr. Thomas Ryan, a psychologist, performed a consultative psychiatric evaluation on Mahamed. Id. at 263. Dr. Ryan wrote that Mahamed reported no psychiatric hospitalizations and no current or past counseling. Id. He further found that Mahamed "denies depression," and has "difficulty with short-term memory, attention and concentration." Id. Under the "Attention and Concentration" section of the report, Dr. Ryan expanded on his earlier finding that her attention and concentration were "impaired. She could

3

do subtraction and counting, but not multiplication or division. Could do serial 3s." Id. at 264. Dr. Ryan expressly asked whether Mahamed had any psychiatric or medical problems, to which she replied that it was primarily her eye. Id. at 265. Dr. Ryan concluded in his medical source statement that Mahamed could "maintain attention and concentration, [and] maintain a regular schedule." Id. He recommended that she may wish to pursue individual counseling, and diagnosed her with Adjustment Disorder. Id. at 265-66.

In December 2011, Mahamed began visiting Dr. Lisa Fortuna at the Refugee and Immigrant Assistance Center in Jamaica Plain, Massachusetts. Id. at 14. On April 27, 2012, Dr. Fortuna completed a University of Massachusetts Medical School Disability Evaluation Services Mental Health Impairment Questionnaire and a Medical Impairment Questionnaire (collectively, the "2012 Questionnaires"). Id. at 37, 43. In the 2012 Questionnaires, Dr. Fortuna diagnosed Mahamed with Post-traumatic Stress Disorder ("PTSD") and Major Depression Disorder. Id. Dr. Fortuna reported that she sees Mahamed biweekly to monthly for psychopharmacology treatment, and that Mahamed participates weekly in individual therapy sessions with a licensed social worker. Id. at 37. Dr. Fortuna prescribed Mahamed Zoloft for her depression and Trazodone for her insomnia. Id. at 39, 43. Both medications started at a 50 mg dosage and gradually increased to 100 mg. Id. at 43.

Under "current signs and symptoms," Dr. Fortuna wrote that Mahamed "presented with depressed mood, insomnia, tearfulness, anhedonia[2], [and] hopelessness [that] had lasted for over 2 years." Id. at 38. In "additional comments," Dr. Fortuna wrote that Mahamed "was suffering from significant depression, sadness, unable to function at start of treatment [and] could not

---

[2] Anhedonia is "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." Merriam-Webster, Inc., Merriam-Webster's Collegiate Dictionary 48 (11th ed. 2003).

4

concentrate." Id. Despite these symptoms, Dr. Fortuna noted that Mahamed had improved over the past four months with psychiatric treatment. Id. at 37-38.

Additionally, Dr. Fortuna specifically reviewed Mahamed's ability to concentrate and focus. Id. at 41. Dr. Fortuna wrote that as of the 2012 Questionnaires, Mahamed's concentration was "'ok'" and that "[she is] able to concentrate when [her] pain is under control." Id. at 41. In discussing vocational programs, Dr. Fortuna found that Mahamed was enrolled in an English language learning program and vocational program, however "she was unable to adequately attend due to pain (eye) and depression/PTSD." Id. at 40.

Mahamed last visited Dr. Fortuna on January 14, 2013. Id. at 14. On March 18, 2013, Dr. Fortuna prepared a progress note on Mahamed's condition ("2013 Report"). Id. Dr. Fortuna noted in the 2013 Report that Mahamed's symptoms were "severe" when she first started seeing Mahamed. Id. Further, although Mahamed's condition had improved, she "continues with significant symptoms which include: depressed mood, anhedonia, insomnia improved only be [sic] medication, poor attention, poor concentration, helplessness, decreases [sic] energy, inability to concentrate." Id. 14. Dr. Fortuna cautioned that social and medical stressors could exacerbate and perpetuate the symptoms, and that "PTSD is a disorder which can be relapsing and disabling, especially in regards to mood, memory, concentration and organization." Id. at 14, 17.

E.  Mahamed's Pre-Hearing Conference

Mahamed appeared at the September 7, 2012 pre-hearing conference with her social worker, but without an attorney. Id. at 54. The ALJ informed Mahamed of her right to representation, and she acknowledged she had also received information about her right prior to the conference. Id. at 55. The ALJ further explained Mahamed's right to an attorney and how

5

she could retain one on a contingency fee basis, or for free through a legal aid clinic.  Id.  The ALJ then asked Mahamed what doctors she was seeing.  Id. at 57.  Mahamed responded that she saw doctors at Boston Medical Center and Mass Eye and Ear Infirmary.  Id.  The ALJ said he would try to get those records.  A.R. at 57.  Mahamed's social worker added that Mahamed also saw a psychiatrist and provided the counseling center's name and location – the Refugee and Immigrant Assistance Center, at 31 Heath Street, Jamaica Plain.  Id. at 57-58.  The ALJ acknowledged the information and agreed to try to obtain all of Mahamed's records.  Id. at 58.

    F.     Mahamed's Hearing

Mahamed attended the hearing before the ALJ with a family friend, but again without counsel.  Id. at 64.  The ALJ asked Mahamed whether she wanted to continue without representation, and she said that she did.  Id. at 65.  Mahamed acknowledged reviewing her file and identified several files that were missing, however she did not mention her missing psychological records.[3]  Id.  The ALJ told Mahamed that he had "taken the authorization that you have given us and have sent for [the Boston Medical Center and the Mass Eye and Ear Infirmary] records," and that they should be in the file.  Id.  The ALJ did not mention any psychological records, or having contacted the Refugee and Immigrant Assistance Center.  Id.

After going through Mahamed's family and work history, the ALJ asked her why she felt she could not work.  Id. at 73.  While she mentioned her blindness, eye pain, back pain from a recent fall, headache, possible multiple sclerosis, and insomnia, she did not mention depression or PTSD.  Id. at 73-77.  She added that she was taking medication to help her fall asleep, but was unsure who prescribed it.  Id. at 76.  The ALJ reviewed the medication and noted that it was from

---

[3] Whether Mahamed can read, let alone read English, is unclear from the record. The record does reveal that she never attended school in Somalia, speaks, at most, limited English, and bears no affirmative evidence of formal education in the United States. Id. at 67-69.

6

Dr. Fortuna. Id. Mahamed verified that this was the extent of her disabilities, and the ALJ did not inquire further. Id. at 76-77.

The ALJ then posed a hypothetical question to the vocational expert regarding the employability of an individual who has the

> same age, education, language and work background as the claimant. Further assume that if there's work that this person could perform it would be subject to the following limitations: this person would be able to lift and carry 50 pounds occasionally, 25 pounds on a frequent basis; would be able to sit for six hours out of an eight hour workday; stand and/or walk for six hours out of an eight hour workday; this person would occasionally be able to stop and kneel; and this person would have to avoid even moderate exposure to unprotected heights and moving and dangerous machinery; would also have a limitation with regards to – this person would not be able to – this person would be blind in their left eye and, and would not be able to do any work that would require the use of both eyes or a particular acuity of vision in both eyes.

Id. at 82-83. The vocational expert testified that such an individual would be able to perform both Mahamed's past work as a peddler, and other jobs, for example janitorial maintenance worker, packager, and sorter. Id. at 83.

The ALJ then posed a second hypothetical asking whether those three jobs would still be appropriate for a person who, besides the restrictions described above, had these further limitations: ability to only do simple two-to-three-step tasks and maintain concentration, persistence and pace for two hour increments over an eight hour workday, over a 40-hour work week; and spoke only limited English. Id. at 84. The vocational expert testified that those jobs would still be available. Id. at 84.

G. The Additional Evidence

On February 13, 2012, prior to the ALJ's February 20, 2012 decision, Mahamed avers that she submitted additional evidence, including the 2012 Questionnaires, to the ALJ. Doc. No.

17 at 6; Doc. No. 25 at 7, 11-12; Doc. No. 26 at 4-6. After the ALJ's decision, but prior to the Appeals Council's review, she submitted the 2013 Report. Doc. No. 26 at 4-6.

      H.      <u>The Administrative Decision</u>

The ALJ completed the requisite five-step analysis to evaluate Mahamed's claim and concluded that she had not been disabled since April 7, 2011, the date she filed the application.[4] A.R. at 22-32. At the first step, the ALJ found that Mahamed had not engaged in substantial gainful activity since April 7, 2011, the application date. <u>Id.</u> at 24. At the second step, the ALJ found that Mahamed has the following severe impairments that significantly limit her ability to perform basic work activities: left eye blindness, headaches, and Adjustment Disorder. <u>Id.</u> At the third step, the ALJ determined that Mahamed "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." <u>Id.</u>

---

[4] The five steps are:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits his or her physical or mental capacity to perform basic work-related functions." If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . .
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

<u>Goodermote v. Sec'y of Health & Human Servs.</u>, 690 F.2d 5, 6-7 (1st Cir. 1982).

The ALJ then determined Mahamed's residual functional capacity: (1) she could perform medium work, except that she could only occasionally stoop and kneel; (2) she could stand/walk for six hours during the course of an eight hour day; (3) she must avoid moderate exposure to unprotected heights and dangerous or moving machinery; (4) she could not do work that required use of the left eye or visual acuity of both eyes; (5) she could do simple two to three-step tasks; (6) she could maintain concentration, persistence or pace for two-hour increments over the course of an eight-hour workday and a forty-hour workweek; and (7) she would speak Somalian and would be unable to speak English, except very limitedly. Id. at 27.

Considering her residual functional capacity, the ALJ found, at the fourth step, that Mahamed could perform her past relevant work as a vendor/peddler. Id. at 31. At the fifth step, the ALJ added that there were a significant number of existing jobs Mahamed could perform, including janitorial maintenance worker, packer, and sorter. Id. at 32. Thus, the ALJ found that Mahamed was not disabled. Id.

In determining Mahamed's residual functional capacity, the ALJ's only mental diagnostic was Dr. Ryan's psychiatric evaluation. Id. at 28-29. The decision mentioned neither Dr. Fortuna nor her reports. Id. at 22-32.

I.      The Appeals Council

On June 4, 2014, the Appeals Council denied Mahamed's request for review. Id. at 1. In their letter, they noted that they "looked at the additional evidence including . . . the April 27, 2012 mental health impairment questionnaire completed by Lisa Fortuna, M.D.; and treatment records with Lisa Fortuna, M.D., dated March 18, 2013." Id. at 2. Nevertheless, they concluded that "this information does not show a reasonable probability that, either alone or when considered with the other evidence of record, would change the outcome of the decision." Id.

II.  STANDARD OF REVIEW

The Court's jurisdiction is limited to reviewing the Administrative Record to determine whether the ALJ applied the proper legal standards and whether the decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam).  Substantial evidence is such relevant evidence as a reasonable mind, reviewing the evidence in the record as a whole, could accept as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Determinations of credibility and the resolution of conflicts in the evidence are for the Commissioner and not for the doctors or for courts.  Id.; see Richardson v. Perales, 402 U.S. 389, 399 (1971).

Nevertheless, administrative findings of fact are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  If the Court finds that the Commissioner's decision is based on legal error or is not supported by substantial evidence, it has the power to modify or reverse the Commissioner's decision, with or without remanding for rehearing.  42 U.S.C. § 405(g).

III.  DISCUSSION

A.  Plaintiff's Contentions

Mahamed raises four objections to the Appeals Council's denial of review.  Doc. No. 17 at 6-12.  First, she claims that the ALJ failed to consider evidence admitted after the hearing, but before the decision, showing that she suffered from PTSD and depression.  She argues that her PTSD, depression, and unfamiliarity with the United States legal system excuse her delay, and that the ALJ should have considered the evidence under 20 C.F.R. §§ 405.331(c)(2) and

405.331(c)(3). Id. at 6-7. Second, Mahamed argues that the Appeals Council committed an egregious error in, after reviewing the additional evidence, failing to find that it would have changed the outcome of the decision. Id. at 7-8. Third, Mahamed asserts that the ALJ erred in finding that she could return to work as a vendor, because her vending experience did not qualify as "past relevant work." Id. at 8-9. Finally, Mahamed contends that the ALJ failed at his responsibility to take care in developing the record, an obligation increased because Mahamed appeared pro se, spoke no English, had no education, and suffered from PTSD and depression. Id. at 9-12.

      B.      <u>The Appeals Council Committed an Egregious Error</u>

The Court first addresses Mahamed's contention that the Appeals Council committed an egregious error when it reviewed the additional evidence and failed to find that it would have changed the ALJ's decision. She argues, therefore, that the Appeals Council improperly refused to review the ALJ's decision.

The Court may review an Appeals Council's refusal to review the ALJ's decision where the refusal is grounded in an "explicit mistake of law or other egregious error." Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001). The Appeals Council commits an egregious error when it mistakenly rejects new evidence either as not material, or as material, but consistent with the record. Id. at 6. Evidence is material where the ALJ's outcome may reasonably have been different had the evidence been introduced. Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 140 (1st Cir. 1987). For mental disabilities, additional evidence is material when it "suggests that the condition may be severe and chronic." Rawls v. Apfel, 998 F. Supp. 70, 77 (D. Mass. 1998); see Martins v. Colvin, No. 13-12030-JGD, 2014 U.S. Dist. LEXIS 125046 at *22-23 (D. Mass. Sept. 8, 2014). Although the Court gives "great deference" to the Appeals

Council's assessment of new evidence, Mills, 244 F.3d at 6, where the Appeals Council offers only a "boilerplate justification for its decision," the Court cannot apply the egregiousness standard and must remand the case. Rosado v. Barnhart, 340 F. Supp. 2d 63, 67-68 (D. Mass. 2004).

Assuming, without deciding, that the Appeals Council's language survives Rosado review, the Court notes that the Appeals Council deemed the additional evidence either immaterial or consistent with the previous findings. The Court accordingly reviews the Appeals Council's denial to determine whether it egregiously erred in finding that the new evidence was either immaterial, or material, but consistent with the other evidence on the record. See Mills, 244 F.3d at 5-6.

The Court finds that the new evidence was both material and inconsistent with the record. First, the new evidence was provided by Mahamed's sole treating psychiatric physician, who had treated her for over a year. The only other record evidence of Mahamed's mental health was a single consultation performed before she even started seeing her treating physician. Second, Mahamed's treating physician provided two new diagnoses, Major Depression Disorder and PTSD, which appear nowhere else in the record.[5] Third, the new evidence shows that Mahamed suffers from new symptoms, such as severe depression and anhedonia. Finally, the new

---

[5] While mere diagnostic labels, unsupported by explanation nor arising from a meaningful treatment foundation, are likely too insufficient to be material, see Canales-Rivera v. Sec'y of Health & Human Servs., No. 91-2099, 1992 WL 98326, at *3 (1st Cir. May 12, 1992) (per curiam) (noting that labels, without more, tell nothing of the severity of a particular ailment); Class Rosario v. Sec'y of Health & Human Servs., No. 90-1144, 1990 WL 151315, at *2 (1st Cir. July 16, 1990) (per curiam) (noting that diagnoses are "medical labels which carry no readily discernible message about the physical capacities of an individual suffering from the conditions they denote"), that concern is inapposite here. Rather than merely listing diagnoses, the new evidence supplies ample information about both the nature and severity of Mahamed's symptoms, and a comprehensive treatment regime.

evidence suggests an increase in the existing symptoms' severity (such as inability to concentrate). Treatment notes and a new treatment regime consisting of two new medications, weekly counseling sessions, and biweekly to monthly psychopharmacology consultations demonstrate this. The new evidence bears on the existence, scope, and nature of Mahamed's mental illness as it existed at the time of the hearing, and its anticipated course. Thus, for the reasons discussed below, the Court finds that this evidence is not sufficiently developed elsewhere in the record and an ALJ, reviewing this evidence, could reasonably have found Mahamed disabled.

      1.      Treating Physician

ALJs often afford more weight to treating sources than consultative examinations, since the treating sources provide a more detailed and longitudinal perspective of the claimant's impairment. 20 C.F.R. § 416.927(c)(2). Further, ALJs must give controlling weight to treating sources well-supported by medical evidence and not inconsistent with other substantial evidence in the record. Id.

The sole record evidence the ALJ used to determine Mahamed's mental impairments is Dr. Ryan's June 2011 consultation. In contrast, Dr. Fortuna started seeing Mahamed in December 2011, and has been treating her for over a year through biweekly and monthly appointments. The new evidence from Dr. Fortuna is material; the ALJ could reasonably have given Dr. Fortuna's reports controlling weight when no other psychiatric treating physician existed in the record. See Demercurio v. Astrue, No. 4:10-CV-132-FL, 2011 U.S. Dist. LEXIS 81693, at *10-11 (E.D.N.C. July 26, 2011) (finding that a treating physician's report was material because the record did not contain the report and it came from a treating physician). This is especially likely since medical and psychological consultant findings about the nature and

severity of a claimant's impairment become opinion evidence of nonexamining physicians at the ALJ and Appeals Council stages. Social Security Rule, SSR 96-5p, 1996 SSR LEXIS 2, at *15. Thus, an ALJ could reasonably find that new evidence from Mahamed's treating physician, when a consultant provided the only other psychiatric evidence, alters the ultimate determination of no disability.

    2.    New Diagnoses

Dr. Fortuna diagnosed Mahamed with PTSD and Major Depression Disorder. A.R. at 37, 43. As these diagnoses are new, they are necessarily inconsistent with the record the ALJ reviewed. Further, although they alone may not be material, new evidence that includes new diagnoses can support a finding that the evidence is material. See Brackett v. Astrue, No. 2:10-cv-24-DBH, 2010 U.S. Dist. LEXIS 137323, at *16 (D. Me. Dec. 29, 2010). An ALJ could therefore reasonably find that the new diagnoses supported a different decision.

    3.    New Symptoms

Dr. Fortuna diagnosed Mahamed with "severe" symptoms, including "depressed mood, anhedonia, insomnia improved only by medication, poor attention, poor concentration, helplessness, decreases [sic] energy, [and] inability to concentrate." A.R. at 14, 38. Further, Dr. Fortuna wrote that Mahamed's PTSD could be "relapsing and disabling, especially in regards to mood, memory, concentration, and organization." Id. at 14, 17.

Dr. Ryan's June 24, 2011 psychiatric evaluation, on which the ALJ relied, reflects some of these symptoms (insomnia, poor attention, poor concentration), see id. at 263-66, which pushes against materiality. See Philbrook v. Colvin, No. 1:14-cv-10766-LTS, 2015 U.S. Dist. LEXIS 65274, at *7 (D. Mass. May 19, 2015) (finding that the evidence was not materially new when it largely summarized information already in the record and which the ALJ had already

considered). Nevertheless a number of symptoms, such as depression and anhedonia, are different. After treating Mahamed for over a year, Dr. Fortuna wrote that Mahamed's depression was still "significant," and warned that it could become increasingly severe. A.R. at 14. In contrast, Dr. Ryan merely noted that Mahamed "denies depression." Id. at 263. Similarly, anhedonia is not mentioned anywhere in the ALJ opinion and there is no discussion on how it would affect her ability to work. Also, it is unclear to what extent Mahamed's PTSD, which Dr. Fortuna says may affect concentration and memory, limits her ability to work. These diagnoses and symptoms are not speculative, but are indications that have lasted for over a year. Cf. McCoy v. Colvin, No. 14-cv-30188-KAR, 2015 U.S. Dist. LEXIS 100435, at *20 (D. Mass. July 31, 2015) (finding that where the new impairment was only speculative, the new evidence was not sufficient to outweigh the deference owed to the Appeals Council).

The Commissioner argues that these new symptoms do not infer further functional limitations. This is simply incorrect. While Dr. Ryan's 2011 report states that Mahamed has the capacity to maintain a regular schedule, Dr. Fortuna's 2012 Questionnaire specifically notes that Mahamed's eye pain and depression/PTSD prevent her from attending an evening English language learning program and vocational program. See A.R. at 40. The ALJ could reasonably find that her failure to attend, due in part to her depression and PTSD, calls Dr. Ryan's assessment into question, and is inconsistent with his finding. See id. As a result, the new symptoms are not only necessarily inconsistent with the record, but material to the ALJ's decision.

4. Increased Severity of Existing Symptoms

The Commissioner further asserts that Dr. Ryan adequately captured Mahamed's ability to concentrate, and that the new evidence is consistent with his finding. Doc. No. 25 at 10. This

is also incorrect, as it mistakenly conflates Mahamed's condition over an eighteen month period. In 2011, Dr. Ryan found that although Mahamed's concentration was impaired, she could "maintain attention and concentration." A.R. at 265. The 2012 Questionnaire indicates, however, that when Dr. Fortuna saw Mahamed in December 2011, she was "suffering from significant depression, sadness, unable to function . . . and could not concentrate." Id. at 38. Four months later, Dr. Fortuna notes that Mahamed's condition had improved, and that she was "[a]ble to concentrate when pain is under control." Id. at 41. In her 2013 Report, Dr. Fortuna writes that although some symptoms have "subjectively and mildly improved," her client still cannot concentrate or pay attention. Id. at 14.

The medical records, from Dr. Ryan's 2011 consultation to Dr. Fortuna's 2013 Report, show Mahamed's ability to concentrate and pay attention had fluctuated, due both to her depression, and her subsequent treatment for it. Given the importance of viewing mental impairments through a longitudinal perspective, see Rawls, 998 F. Supp. at 77 (noting the need for a longitudinal view of mental health), the record does not support the conclusion that the additional evidence submitted could be viewed as consistent with Dr. Ryan's assessment of Mahamed's ability to concentrate. Thus, although Mahamed had impaired concentration in 2011 and 2013, the ALJ could reasonably find that the 2013 Report indicates increased severity, implying a substantial difference between the earlier and later assessment. Cf. Mills, 244 F.3d at 6 (finding that new evidence was consistent with previous findings because it made no assessment of severity and the court was therefore unable to determine whether the difference between the new and old evidence was very substantial).

Mahamed's treatment history provides further evidence that the severity of her conditions has increased, making them inconsistent with the record, and material to the ALJ's

16

determination.  Dr. Ryan notes that Mahamed received no psychiatric counseling as of his June 24, 2011 report and recommended that she seek individual counseling.  The ALJ used this information in reaching his decision.  Nonetheless, at the time of the 2012 hearing, Mahamed had been in counseling with a licensed social worker for a year in weekly therapy sessions.  Further, she had biweekly to monthly psychopharmacological treatment with Dr. Fortuna.  The ALJ could reasonably find that these therapy sessions, absent from the record, demonstrated an increased severity of Mahamed's symptoms.

Dr. Ryan wrote that Mahamed's medications were "Combigan 1 bottle, atropine 500 mg, Pred Forte 1 bottle, Azopt 1 bottle, Q-Pap 500 mg three times a day."  None of these medications are antidepressants; rather, they treated her eye.  See A.R. at 267, 274-75, 280-82, 351.  At the time of the hearing, however, Mahamed was taking two antidepressants each once per day: 50 mg of Zoloft (which increased to 100 mg) and 100 mg of Trazodone.  The ALJ could reasonably find that these medications, absent from the record, are further evidence of the Mahamed's symptoms' increased severity.

In sum, this is not a case where Mahamed submitted a lone "progress note" confirming the diagnosis of two previously asserted ailments and offering no assessment of increased severity.  See Mills, 244 F.3d at 6-7.  Rather, she seeks to add her treating psychiatric physician, whose reports show new diagnoses, new symptoms, and an increase in the severity of existing ones, to the record.  This information potentially bears in a significant way on the RFC.  That this information was mentioned in the prehearing conference, but never included in the record, further militates towards remand.  Efforts ought to be made to obtain Dr. Fortuna's medical notes on remand.  The Court therefore concludes that the Appeals Council erred to the extent that it determined that the new evidence was immaterial, or material, but consistent with the record.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's Motion to Affirm (Doc. No. 24) and ALLOWS Mahamed's Motion to Remand (Doc. No. 16).[6]

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[6] Because the Court remands on Mahamed's second contention, the Court declines to address her others.